PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JUDY BOGART,
                     *Plaintiff-Appellant,*

          v.

ROBBIE CHAPELL, in his individual
and official capacities; YORK
COUNTY HUMANE SOCIETY, in its
individual and official capacities;
YORK COUNTY SHERIFF'S
DEPARTMENT; YORK COUNTY ANIMAL
CONTROL; KATHY SOWELL; ARTHUR
MOORE; DONALD BARNETT; M. B.
MABRY; LESTER TERRY, in their
individual and official capacities;
BRUCE M. BRYANT, as Sheriff of
York County; COUNTY OF YORK,
                     *Defendants-Appellees,*

          and

DELLA MARTIN; DARLENE STEER,
                     *Defendants.*

No. 03-2092

Appeal from the United States District Court
for the District of South Carolina, at Rock Hill.
Cameron McGowan Currie, District Judge.
(CA-01-467-0)

Argued: June 4, 2004

Decided: February 2, 2005

Before WILLIAMS and KING, Circuit Judges,
and Louise W. FLANAGAN, United States District Judge for the
Eastern District of North Carolina, sitting by designation.

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Flanagan joined. Judge Williams wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** Kevin Roger Eberle, ROSEN, ROSEN & HAGOOD, L.L.C., Charleston, South Carolina, for Appellant. Andrew Frederick Lindemann, DAVIDSON, MORRISON & LINDEMANN, P.A., Columbia, South Carolina, for Appellees. **ON BRIEF:** Mary Ann Hall, Charleston, South Carolina, for Appellant. Terry B. Millar, TERRY B. MILLAR, L.L.C., Rock Hill, South Carolina; R. Bryan Barnes, Thomas McRoy Shelley, III, Katherine B. Barroll, ROGERS, TOWNSEND AND THOMAS, P.C., Columbia, South Carolina, for Appellees.

---

## OPINION

KING, Circuit Judge:

Judy Bogart appeals from the district court's award of summary judgment on her procedural due process claim, initiated under 42 U.S.C. § 1983, in connection with the euthanization of more than two hundred dogs and cats seized from her residential property. Bogart's appeal calls upon us to analyze and apply the decisions of the Supreme Court in *Parratt v. Taylor*, 451 U.S. 527 (1981), *Hudson v. Palmer*, 468 U.S. 517 (1984), and *Zinermon v. Burch*, 494 U.S. 113 (1990). In each of those cases, the Court evaluated the viability of a § 1983 claim that state employees, disregarding established state procedures, had deprived the plaintiff of property or liberty without a prior hearing, in contravention of the procedural aspects of the Fourteenth Amendment's Due Process Clause. The Court held in *Parratt* and *Hudson* that such a deprivation cannot be challenged under § 1983 if the employees' conduct was random and unauthorized — rendering it impracticable for the State to provide a predeprivation hearing — so long as the State has provided for an adequate postdeprivation remedy. *Hudson*, 468 U.S. at 533; *Parratt*, 451 U.S. at 541.

The Court elaborated on this rule in *Zinermon*, explaining that the *Parratt/Hudson* doctrine is not applicable if the State had accorded its employees broad power and little guidance in effecting the deprivation. *Zinermon*, 494 U.S. at 135.

Relying on the *Parratt/Hudson* doctrine, the district court held that Bogart did not possess a viable § 1983 claim, because the destruction of her animals was in contravention of procedures spelled out in the South Carolina Code (and thus out of the State's control), and because the State's postdeprivation remedies were sufficient to compensate Bogart for her losses. *See Bogart v. County of York*, No. 01-CV-467, slip op. at 12-15 (D.S.C. July 11, 2003) (the "Summary Judgment Order"). Bogart maintains on appeal that her claim is saved by the *Zinermon* principle, in view of a locally adopted policy conferring discretion on an official to euthanize animals deemed to be sick or injured. As explained below, we reject Bogart's contention and affirm the district court.

I.

A.

Over several years, Bogart participated in animal rescue activities through various volunteer organizations in and around Rock Hill, South Carolina, including a group called Carolina Castaways. Bogart's efforts involved adopting dogs and cats from shelters where they otherwise may have been euthanized. Bogart kept the animals inside and outside her single-wide mobile home, which had a small fenced backyard. In late 1998 and throughout 1999, the York County Humane Society (the "YCHS") and its board co-chairman, local veterinarian Robbie Chappell,[1] received complaints from other local veterinarians and members of Carolina Castaways regarding the number and condition of animals in Bogart's care, including personal pets and animals belonging to Carolina Castaways. Dr. Chappell met with Bogart at her home in late June 1999 to counsel her concerning the animals, but the complaints continued.

---

[1]While Dr. Chappell was referred to as "Chapell" in district court documents, the parties refer to him on appeal as "Chappell," the spelling we utilize herein.

In early November 1999, after observing twice as many dogs in Bogart's yard as had been there in June, Dr. Chappell requested Deputy Brent Mabry of the York County Sheriff's Department to investigate the situation. Deputy Mabry drove by Bogart's property, at which time he smelled a strong animal odor and heard a large number of barking dogs. Bearing in mind Dr. Chappell's admonition that Bogart was unlikely to voluntarily permit examination of the animals, Mabry decided to request a search warrant from a local magistrate judge. On November 16, 1999, the magistrate judge issued a warrant for the search of Bogart's residential property and the seizure of any animals there that had been mistreated or housed improperly. Dr. Chappell planned to accompany Mabry in executing the search warrant. Mabry knew that Dr. Chappell intended to immediately euthanize at least some of the animals, but did not share that information with the judge.

Deputy Mabry also conferred about the search, which was scheduled for November 17, 1999, with Lester Terry, the supervisor of York County Animal Control. Officer Terry had been contacted as well by Dr. Chappell, who had advised Terry to "have a lot of trucks ready" based on the assumption that many of the animals would be seized. Dr. Chappell and Terry later disagreed over whether their first conversation about the impending seizure occurred as long as a week or just two days before the event. However, they agreed that Dr. Chappell estimated that Bogart had at least eighty to ninety animals on her premises. They also agreed that Dr. Chappell anticipated that at least some of the animals would be euthanized immediately, and others might be housed by the YCHS and the York County Animal Shelter (the "Shelter") if space was available for them. According to Officer Terry, Dr. Chappell called him again on the day of the seizure; when Terry informed Dr. Chappell that the Shelter was nearly at full capacity, Dr. Chappell said that *all* of the animals to be taken from Bogart's property were diseased and needed to be euthanized anyway. There is no dispute that Dr. Chappell, at that time, had not closely examined the animals.

The search and seizure at Bogart's mobile home was executed on November 17, 1999, as planned. The participants included Dr. Chappell and at least one of his employees, representatives of the YCHS, Deputy Mabry and other law enforcement officers, and Officer Terry

and other animal control officers. At first, Deputy Mabry did not serve the search warrant on Bogart, because she allowed Mabry, Dr. Chappell, and those accompanying them to examine and even remove some of the approximately twenty-five dogs in her backyard. Thereafter, however, Bogart began to move dogs into her home through the back door. Mabry then confronted Bogart at the front door, serving her with the search warrant so that there could be an examination of the animals inside the home. According to Mabry, Bogart made an effort to reenter the home in an evasive manner, prompting Mabry and others to handcuff her and escort her to a waiting patrol car. Bogart was then arrested for ill treatment of the animals, in violation of section 47-1-40 of the South Carolina Code.[2] The remainder of Bogart's dogs and cats were subsequently removed from inside the home.

In total, 82 dogs and 129 cats were seized from Bogart's property. All but two of the dogs and some of the cats had been euthanized by the following morning. At that time, Bogart arrived at the Shelter and requested some of her pets. Officer Terry called Dr. Chappell, who gave permission for Bogart to take the two surviving dogs and her choice of five of the remaining cats. Those cats not selected were killed later that morning.

Neither Dr. Chappell, who allegedly ordered the euthanizations, nor Officer Terry, who oversaw the procedures, would accept the ultimate responsibility for deciding the animals' fates. Dr. Chappell informed the press just after the raid on Bogart's property that her animals had been killed because of their poor health, as well as space limitations at the Shelter. However, it does not appear that all, or even many, of the more than two hundred doomed animals were closely examined by Dr. Chappell or any other veterinarian prior to euthanization. Rather, Dr. Chappell quickly inspected some of the animals as they were being removed from Bogart's property. Dr. Chappell conceded in this litigation that, if he had examined the dogs once they arrived at the Shelter, as many as fifteen to twenty of them might have been found healthy enough to save. Moreover, an expert for the Defendants opined that, if space at the Shelter was a problem, some

---

[2]Bogart was released from custody a few hours after her arrest, and the charge against her was subsequently *nolle prossed*.

of the animals could have remained on Bogart's property for at least another day without "much more jeopardy than they were already in" until room could be found for them elsewhere. In any event, it was not disputed that this was the first and only time that York County officials had immediately — and, one could find, indiscriminately — destroyed animals that had just been seized in conjunction with the arrest of their custodian for mistreatment of them.

On January 8, 2001, Bogart filed a complaint in the York County Court of Common Pleas against various participants in the search of her property, her arrest, and the seizure and euthanization of her animals, including Dr. Chappell, the YCHS, Deputy Mabry, and Officer Terry (collectively, the "Defendants"). In Bogart's complaint, which was amended on March 7, 2001, she asserted federal constitutional claims under 42 U.S.C. § 1983. These included the claim that her procedural due process rights were violated when the Defendants destroyed her dogs and cats without a predeprivation hearing. Bogart also alleged state law causes of action for violation of South Carolina's constitution and for the tort of outrage.

The Defendants removed the litigation, on February 16, 2001, to the District of South Carolina, which possessed jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367(a). Following discovery, the Defendants moved for summary judgment on all claims. On April 17, 2002, the court heard argument on the Defendants' motions and, by a bench ruling, granted summary judgment as to all claims against two of the Defendants, Darlene Steer and Della Martin, both members of the YCHS. *See* Record on Appeal at 36. The court also awarded summary judgment as to Bogart's outrage claim against the other Defendants in their official capacities. *Id.*

Bogart subsequently filed a second amended complaint, naming a new Defendant and altering some of her claims. On September 27, 2002, the Defendants moved again for summary judgment. The court heard argument on these motions on July 2, 2003, and promptly granted summary judgment to all Defendants on Bogart's § 1983 claims, including the procedural due process claim that is the subject of this appeal. Summary Judgment Order at 2-3. Relevantly, the court concluded that Bogart's procedural due process claim was not viable under the *Parratt/Hudson* doctrine, because, *inter alia*, the euthaniza-

tion of Bogart's animals was in contravention of nondiscretionary procedures set forth in the South Carolina Code. *Id.* at 12.[3] Additionally, because the procedural due process and other § 1983 claims were the sole source of federal jurisdiction, the court remanded the balance of the litigation to the state court. *Id.* at 3.

The district court's judgment order was entered on July 16, 2003. Bogart thereafter filed a motion, on July 21, 2003, seeking to alter or amend the judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure (the "Rule 59(e) Motion") with regard to the procedural due process claim against Officer Terry. In her supporting memorandum, Bogart asserted new evidence — a York County Animal Control policy according Officer Terry, as the Animal Control Officer, the discretion to dispose of sick or injured animals (the "York County Policy") — that was available when the court was considering summary judgment issues but that was not then presented to the court. The court denied the Rule 59(e) Motion. *Bogart v. County of York*, No. 01-CV-467, slip op. at 3 (D.S.C. Aug. 8, 2003) (the "Rule 59(e) Order").

Bogart filed her notice of appeal on August 28, 2003, and we possess jurisdiction under 28 U.S.C. § 1291. She has limited her appeal to the contention that the district court erred in relying on the *Parratt/Hudson* doctrine to award summary judgment to the Defendants on her procedural due process claim, and she requests this Court, in weighing her appeal, to consider the York County Policy she first introduced with her Rule 59(e) Motion.

---

[3]Under various provisions of the South Carolina Code regarding cruelty to animals, law enforcement officers and humane society agents who seize animals are required to care for them pending the outcome of civil or criminal court proceedings. If the court rules that the owner is fit to have custody of the animal, it is to be returned to the owner. Or, if the owner is convicted of an animal cruelty charge, she forfeits custody of the animal. Only then is the officer or agent authorized to make "humane disposition" of the animal (which presumably includes the option of euthanization). *See* S.C. Code Ann. §§ 47-1-120, -140, -150, -170.

## II.

As a preliminary matter, we are obliged to identify those particular matters over which we possess jurisdiction. That is, the Defendants contend that our review is limited to the Summary Judgment Order, because Bogart's notice of appeal specifies that she is appealing from that order.[4] They maintain that we cannot review the Rule 59(e) Order, because the notice of appeal does not mention it, and Bogart did not explicitly state in her opening brief that the court erred in denying her Rule 59(e) Motion. Thus, according to the Defendants, we cannot consider the new evidence (the York County Policy) that Bogart attempted to introduce by way of her Rule 59(e) Motion.

Under the Federal Rules of Appellate Procedure, an appellant must "designate the judgment, order, or part thereof being appealed" in her notice of appeal. Fed. R. App. P. 3(c)(1)(B). The Supreme Court has construed Rule 3 as jurisdictional in nature. *See Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 317 (1988). However, "[i]n order to avoid technical impediments to appellate review, we construe Rule 3(c) liberally." *Canady v. Crestar Mortgage Corp.*, 109 F.3d 969, 974 (4th Cir. 1997). Therefore, "an error in designating the issue appealed will not result in a loss of appeal as long as the intent to appeal a specific judgment can be fairly inferred and the appellee is not prejudiced by the mistake." *Id.* (citations and internal quotation marks omitted); *see also Dang v. Comm'r*, 259 F.3d 204, 207-08 (4th Cir. 2001). The appellant simply needs to address the merits of a particular issue in her opening brief in order to demonstrate that she had the intent to appeal that issue and the appellees were not prejudiced by her mistake, inasmuch as they had notice of the issue and the opportunity to fully brief it. *Canady*, 109 F.3d at 974 (citations omitted).

Although we do not commend the careless formulation of Bogart's notice of appeal, we must conclude that Bogart's intent to appeal from

---

[4]The notice of appeal states that Bogart appeals "from the Order granting Defendants' Motion for Summary Judgment and remanding the case which was entered in this action on July 21, 2003." The Summary Judgment Order actually was entered, however, on July 11, 2003. The Defendants concede that the date reflected in the notice of appeal was simply a "scrivener's error."

the Rule 59(e) Order can be readily inferred from the discussion in her opening brief of the York County Policy's effects on the viability of her § 1983 procedural due process claim. That discussion sufficiently informed the Defendants that Bogart was challenging the court's denial of her Rule 59(e) Motion. The Defendants had the opportunity to fully brief the relevant issues and, indeed, they did so. Therefore, the Defendants were not prejudiced by the mistakes in Bogart's notice of appeal, and we may properly consider the denial of Bogart's Rule 59(e) Motion.

### III.

We review the district court's denial of the Rule 59(e) Motion for abuse of discretion. *See United States v. Westinghouse Savannah River Co.*, 305 F.3d 284, 290 (4th Cir. 2002). As we have observed, a court may grant a Rule 59 motion in three circumstances: "'(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice.'" *Id.* (quoting *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998)).

By contrast, we review de novo the court's award of summary judgment to the Defendants, viewing the facts and inferences drawn therefrom in the light most favorable to Bogart. *See Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 418 (4th Cir. 2004). "An award of summary judgment is appropriate only 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, . . . show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)) (alteration in original).

We begin our review by summarizing the Summary Judgment Order and the Rule 59(e) Order. We then consider whether the district court abused its discretion in denying Bogart's Rule 59(e) Motion, by which she sought to introduce the York County Policy as new evidence in opposition to summary judgment. Because the denial of the Rule 59(e) Motion was not error, we subsequently address, without regard to the new evidence, whether the award of summary judgment to the Defendants was appropriate under the *Parratt/Hudson* doctrine.

In so doing, we survey the relevant Supreme Court decisions and explain why the *Parratt*/*Hudson* doctrine precludes Bogart's procedural due process claim, despite her attempt to rely on the *Zinermon* principle.

IV.

In its Summary Judgment Order, the district court set forth the core requirement for Bogart's claims under § 1983, that she was "'deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law.'" Summary Judgment Order at 7 (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999)). With regard to Bogart's procedural due process claim in particular, the court recognized that the Fourteenth Amendment "provides that no State shall 'deprive any person of life, liberty, or property, without due process of law,'" *id.* (quoting U.S. Const. amend. XIV, § 1), and that the fundamental requirement of due process is the opportunity to be heard "'at a meaningful time and in a meaningful manner'" (usually prior to the deprivation of a protected interest), *id.* at 7-8 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (other citations and internal quotation marks omitted). The court specifically acknowledged Supreme Court precedent holding that a person may possess a property interest in an animal, but that a property interest in an animal is of a qualified nature subject to the legitimate exercise of the State's police powers. *Id.* at 8 (citing *Nicchia v. New York*, 254 U.S. 228, 230 (1920); *Sentell v. New Orleans & Carrollton R.R. Co.*, 166 U.S. 698, 705 (1897)). The court also referred to decisions from other federal and state courts recognizing that, absent exigent circumstances, a person has a right to due process prior to the destruction of her animal. *Id.* at 8-9 (citing *Porter v. DiBlasio*, 93 F.3d 301, 306-07 (7th Cir. 1996); *DiCesare v. Stuart*, 12 F.3d 973, 978 (10th Cir. 1993)) (other citations omitted).

The court noted that, in this matter, it is undisputed that the Defendants failed to provide Bogart with notice or an opportunity to be heard before the euthanization of her dogs and cats, and that, in the light most favorable to Bogart, there were no exigent circumstances justifying the immediate destruction of her animals. Summary Judg-

ment Order at 9.[5] Nonetheless, relying on the *Parratt/Hudson* doctrine, the court concluded that Bogart could not sustain her procedural due process claim. *Id.* at 9-16. The court explained that, where a deprivation of property is the result of a state employee's random and unauthorized act, the Constitution requires only adequate postdeprivation tort remedies, and not a predeprivation hearing. *Id.* at 10 (citing *Zinermon*, 494 U.S. at 128; *Parratt*, 451 U.S. at 541).

The court observed that the Defendants failed to abide by the procedures that South Carolina had in place for the care and disposition of animals seized from their owners, particularly section 47-1-150(F) of the South Carolina Code. Summary Judgment Order at 12.[6] The

---

[5]The court did not address the contention of some of the Defendants, including Dr. Chappell, that they were not state actors. For purposes of this appeal, the Defendants do not dispute that each of them acted under color of state law.

[6]The court noted that the Defendants took custody of Bogart's animals pursuant to section 47-1-150(C) (allowing seizure by court order preceding owner's arrest), or alternatively section 47-1-120 (authorizing, along with section 47-1-140, seizure upon owner's arrest), or both sections 47-1-150(C) and -120. Summary Judgment Order at 12 n.7. A seizure under any of these statutory provisions appears to be subject to the protections of section 47-1-150(F), which provides:

> The officer or agent of any county or of the South Carolina Society for the Prevention of Cruelty to Animals, or of any society incorporated for that purpose, taking charge of an animal as provided for in this section shall provide for the animal until either:
>
> (1) The owner is adjudged by the court to be able to provide adequately for, and have custody of, the animal, in which case the animal shall be returned to the owner upon payment for the care and provision of the animal while in the agent's or officer's custody; or
>
> (2) The animal is turned over to the officer or agent as provided in Section 47-1-170 [providing for the owner's forfeiture of the animal upon conviction on an animal cruelty charge] and a humane disposition of the animal is made.

The parties disagree on appeal over precisely which statutory provisions applied to the seizure of Bogart's animals. However, we need not

court concluded that the Defendants' conduct in immediately euthanizing Bogart's animals was random and unauthorized, and the State could not have foreseen that the Defendants would contravene state law and ignore established procedures. *Id.* at 13. Based on the additional determination that South Carolina's postdeprivation tort remedies were adequate to compensate Bogart for her losses,[7] the court held that Bogart's procedural due process claim is precluded by the *Parratt/Hudson* doctrine. *Id.* at 13-15.

In awarding summary judgment to the Defendants, the court rejected Bogart's contention that this case is like *Zinermon*. There, the Supreme Court declined to disallow a procedural due process claim under the *Parratt/Hudson* doctrine where the plaintiff "sought to hold 'state officials accountable for their abuse of their broadly delegated, uncircumscribed power to effect the deprivation at issue.'" Summary Judgment Order at 12 (quoting *Zinermon*, 494 U.S. at 136). The court distinguished *Zinermon* on the ground, *inter alia*, that these Defendants were not given authority under the South Carolina Code to destroy Bogart's animals immediately after seizing the animals and merely arresting Bogart on an animal cruelty charge. *Id.* at 13.

In support of her subsequent Rule 59(e) Motion, Bogart presented the York County Policy, which, she contended, empowered Officer Terry with broad discretion to destroy sick and injured animals.[8]

---

decide that issue. All of the provisions required the Defendants to care for Bogart's dogs and cats pending court adjudication of the criminal charge against her and/or of her fitness to regain custody of the animals. And none of the provisions authorized the Defendants to euthanize the animals immediately after their seizure.

[7]The court pointed to the Defendants' concessions that Bogart possessed viable state causes of action against them for negligence and conversion/trespass to chattels, and that she could recover damages for emotional distress inasmuch as evidence existed to show that she had suffered physical harm as a result of the loss of her animals. Summary Judgment Order at 13-14.

[8]The York County Policy, entitled "Animals Sick or Injured," provides in full:

Bogart maintained, in relevant part, that the *Parratt*/*Hudson* doctrine's exception to § 1983 liability for random and unauthorized acts was inapplicable in this case because, while the Defendants' conduct violated the South Carolina Code, Officer Terry was simultaneously authorized by the York County Policy to exercise discretion to euthanize her animals.

The court denied the Rule 59(e) Motion for reasons proffered by the Defendants. *See* Rule 59(e) Order at 3. First, the York County Policy constituted new evidence that was available, but not presented to the court or made part of the record, when the court considered the summary judgment motions. Second, the Policy was never properly authenticated; for example, there was no indication in the record that the Policy was even in effect at the time of the seizure of Bogart's animals. Third, by its plain terms, the Policy authorized immediate euthanization of animals only in exigent circumstances, and the court already had concluded that there were no such circumstances. And fourth, the Policy could not apply to the destruction of Bogart's animals, because it would have allowed Officer Terry to exercise his discretion only when an animal was brought into the Shelter *after* normal working hours, and the seizure of Bogart's dogs and cats undeniably began *during* normal working hours. On these grounds, the court concluded that the Rule 59(e) Motion "neither argues that an intervening change in the law has occurred or that new evidence has come to light, nor raises any meritorious grounds showing that reversal of the Court's July 11, 2003 [Summary Judgment Order] is necessary to correct a clear error of law or prevent manifest injustice." Rule 59(e) Order at 3.

---

> If a sick or injured animal is brought into the shelter during normal working hours, then the animal will be taken to the closest vet. If one is picked up after normal working hours then the Animal Control Officer will make the decision as to the fate of the animal. If the animal has an I.D. tag with the animals [sic] vet, then you should first make every effort to contact the vet. At no time should the animal go through unnecessary suffering if delay exists on contacting the vet.

Record on Appeal at 78.

V.

We now assess whether the district court abused its discretion in denying Bogart's Rule 59(e) Motion. Because that ruling was not error, we subsequently consider, without regard to the York County Policy, whether the award of summary judgment to the Defendants was proper.

A.

We will not reverse a court's refusal to consider new evidence in support of a Rule 59(e) motion where the movant presented no legitimate justification for failing to timely submit the evidence and had advance notice of the summary judgment issues. *See Hughes v. Bedsole*, 48 F.3d 1376, 1382 (4th Cir. 1995) (offering no reason at all); *Cray Communications, Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 395 (4th Cir. 1994) (believing presentation of affidavit was "unnecessary" at summary judgment stage); *RGI, Inc. v. Unified Indus., Inc.*, 963 F.2d 658, 662 (4th Cir. 1992) (misunderstanding parties' burdens under summary judgment standard). Bogart's excuse for not submitting the York County Policy to the court prior to its consideration of the summary judgment motions is that her attorneys did not foresee that the court would rely on the *Parratt/Hudson* doctrine to reject her procedural due process claim. That is, counsel believed that the court would focus instead on whether Bogart's claim failed on the ground that the euthanization of her animals was justified by the existence of exigent circumstances. This assertion does not constitute a legitimate justification for Bogart's neglect to promptly present the Policy to the court, especially in view of the fact that the applicability of the *Parratt/Hudson* doctrine was an issue raised early and often in this litigation.

Generally, we will not examine evidence, such as the York County Policy, that was inexcusably proffered to the district court only after the court had entered its final judgment. *See Kaiser Aluminum & Chem. Corp. v. Westinghouse Elec. Corp.*, 981 F.2d 136, 140 (4th Cir. 1992) (recognizing rule "that affidavits and exhibits not before the court in making its decision are not to be considered on appeal"). Even so, we may examine such evidence in order to determine whether "the additional evidence, though filed untimely, indicate[s]

that the decision under review, if upheld, would result in a miscarriage of justice." *Id.*; *see also Hughes*, 48 F.3d at 1384 n.7. Our examination of the new evidence in this appeal is not helpful to Bogart, however. Bogart has not shown that the Policy was even in place when her dogs and cats were seized, much less that Officer Terry relied on it. Moreover, the Policy did not authorize Officer Terry to decide during normal working hours to euthanize Bogart's animals under nonexigent circumstances.[9] Because the Policy did not sanction Officer Terry's conduct, we reject Bogart's contention that this new evidence could preclude application of the *Parratt/Hudson* doctrine to her § 1983 procedural due process claim against him. Accordingly, we affirm the court's denial of her Rule 59(e) Motion.

## B.

Without regard to the York County Policy, we turn to the question of whether the court erred in relying on the *Parratt/Hudson* doctrine to award summary judgment to the Defendants on Bogart's § 1983 claim. Specifically, we survey the relevant Supreme Court decisions in *Parratt*, *Hudson*, and *Zinermon*. We then explain why, in view of that controlling precedent, Bogart cannot establish her claim for deprivation of her animals in contravention of the procedural aspects of the Due Process Clause of the Fourteenth Amendment.

## 1.

In its 1981 *Parratt* decision, the Supreme Court considered whether an inmate at a Nebraska prison, who ordered $23.50 worth of hobby materials by mail, could sustain a § 1983 procedural due process claim for the negligent loss of the materials by prison officials. 451 U.S. at 529. The Court was concerned with, *inter alia*, whether it was practicable for the State to provide a predeprivation

---

[9]The Policy arguably conferred discretion on the Animal Control Officer to euthanize sick or injured animals picked up after normal working hours, regardless of exigent circumstances. Plainly, however, the Animal Control Officer was empowered to decide an animal's fate during normal working hours only under exigent circumstances, *i.e.*, if the animal would unnecessarily suffer as the result of delay in contacting a veterinarian to examine it. *See supra* note 8.

hearing, and whether the postdeprivation tort remedies provided by the State were constitutionally sufficient. *Id.* at 537-44. The Court concluded that the prisoner did not possess a viable § 1983 claim because, in relevant part, "the deprivation did not occur as a result of some established state procedure" but rather "as a result of the unauthorized failure of agents of the State to follow established state procedure," and because "the State of Nebraska has provided respondent with the means by which he can receive redress for the deprivation." *Id.* at 543. Of key significance, the loss of the prisoner's property was the "result of a random and unauthorized act by a state employee." *Id.* at 541. The Court explained that, because the State could not predict precisely when such a loss would occur, the State could not be expected to provide a meaningful predeprivation hearing. *Id.*

The Court extended its *Parratt* holding, in its 1984 *Hudson* decision, to intentional deprivations of property. *Hudson*, 468 U.S. at 533.[10] The plaintiff in *Hudson*, an inmate at a Virginia prison, alleged that a correctional officer had intentionally destroyed some of the prisoner's noncontraband property during a search of his cell. *Id.* at 519-20. The lower courts, including this Court, had concluded that the logic of *Parratt* applied equally to unauthorized intentional deprivations of property by state employees. *Id.* at 520-21 (citing 697 F.2d 1220, 1223 (4th Cir. 1983)). The Supreme Court agreed, explaining that "[t]he underlying rationale of *Parratt* is that when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply 'impracticable' since the state cannot know when such deprivations will occur." *Id.* at 533. Thus, under the *Parratt/Hudson* doctrine, such a deprivation "does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Id.*

---

[10]*Parratt* was later overruled in part by *Daniels v. Williams*, 474 U.S. 327, 330-31 (1986), to the extent that it held that mere negligence on the part of a state employee may "deprive" one of a protected interest under the Due Process Clause. Because Bogart alleges that the Defendants intentionally deprived her of her cats and dogs, the *Daniels* rule is not relevant to our consideration of the viability of Bogart's procedural due process claim.

In its 1990 *Zinermon* decision, the Court underscored the narrow scope of the *Parratt*/*Hudson* doctrine. The *Zinermon* plaintiff brought suit under § 1983, alleging that various personnel at a Florida state hospital had deprived him of his liberty without due process by admitting him to the hospital as a "voluntary" mental patient despite his incompetency to give informed consent, instead of utilizing involuntary admission procedures. 494 U.S. at 114-15. The plaintiff contended that the hospital personnel abused the sweeping power that had been conferred on them by Florida's statutory scheme for admitting mental patients. *Id.* at 123-24, 136. Relying on the *Parratt*/*Hudson* doctrine, the hospital personnel countered that the plaintiff failed to state a § 1983 procedural due process claim because he alleged only a random, unauthorized violation of the statutes, and because adequate state remedies for unlawful confinement were available to him. *Id.* at 130 & n.15. However, the *Zinermon* Court concluded that the *Parratt*/*Hudson* doctrine did not control the dispute before it "for three basic reasons," all arising from the State's bestowal on hospital personnel of broad authority, with minimal guidance, in admitting mental patients. *Id.* at 136. Those reasons were: (1) that the deprivation of plaintiff's liberty was not "unforeseeable"; (2) that predeprivation process was not "impossible"; and (3) that the hospital personnel could not characterize their conduct as "unauthorized" within that term's meaning in *Parratt* and *Hudson*. *Id.* at 136-38, *applied in Plumer v. Maryland*, 915 F.2d 927, 929-31 (4th Cir. 1990); *Fields v. Durham*, 909 F.2d 94, 96-97 (4th Cir. 1990).[11]

---

[11]We respectfully disagree with our dissenting colleague, under whose view our application of the *Zinermon* principle in *Plumer* and *Fields* essentially bars us from applying the *Parratt*/*Hudson* doctrine to any procedural due process claim. In both *Plumer* and *Fields*, the state actors (like those in *Zinermon*) were empowered by the State with the authority to effect the deprivations at issue and the duty to provide the plaintiffs with predeprivation procedural safeguards. *See Plumer*, 915 F.2d at 931; *Fields*, 909 F.2d at 97. Thus, our colleague's analysis of the reach of *Plumer* and *Fields* is suited only for disputes involving similar delegations of power. Those situations "create[ ] enormous line-drawing problems" for courts obliged to determine whether the breadth of the delegated power was sufficient to impose § 1983 liability for its misapplication. *Zinermon*, 494 U.S. at 147-48 (O'Connor, J., dissenting).

However, as Justice O'Connor (joined by three of her colleagues) recognized in her *Zinermon* dissent, "in the absence of . . . broadly delegated

2.

Under the principles enunciated by the Supreme Court, we are constrained to conclude that this dispute fits squarely within the *Parratt*/*Hudson* doctrine, and, thus, that the district court properly awarded summary judgment to the Defendants on Bogart's § 1983 procedural due process claim. The doctrine controls the viability of Bogart's claim because the euthanization of Bogart's animals by the Defendants was random and unauthorized, and because, as Bogart does not dispute on appeal, South Carolina affords a meaningful post-deprivation remedy for the loss of her animals. *See Hudson*, 468 U.S. at 533; *Parratt*, 451 U.S. at 541. We reject as unavailing Bogart's contention that her claim is saved by the *Zinermon* principle. As explained below, the three factors that caused the *Zinermon* Court not to apply the *Parratt*/*Hudson* doctrine in that case, do not exist here. *See Zinermon*, 494 U.S. at 136-38.

First, the deprivation of Bogart's animals, unlike the deprivation of the *Zinermon* plaintiff's liberty, was unforeseeable. In *Zinermon*, because the State did not specify how to determine whether a patient was competent at the time he was asked to sign admission forms, it was "hardly unforeseeable" that the patient's apparent willingness to be admitted would be taken at face value. 494 U.S. at 136. Indeed, the State knew precisely when any resulting erroneous deprivation would occur: "at a specific, predictable point in the admission process — when a patient is given admission forms to sign." *Id.* That fore-

---

power . . . *Parratt* and *Hudson* still govern." *Id.* at 148; *see also Albright v. Oliver*, 510 U.S. 266, 284-85 (1994) (Kennedy, J., concurring in judgment) (observing that, though courts "have been cautious in invoking the rule of *Parratt*," the decision's "precedential force must be acknowledged"). Indeed, in *Plumer* and *Fields*, we acknowledged the continuing vitality of the *Parratt*/*Hudson* doctrine, albeit in limited situations. *Plumer*, 915 F.2d at 930; *Fields*, 909 F.2d at 97. Because the doctrine remains sound law, we are bound to apply it in appropriate circumstances. *See Carolina Cotton Growers Ass'n, Inc. v. United States*, 785 F.2d 1195, 1200 (4th Cir. 1986). And, at the very least, those circumstances include cases (such as this one) where state actors have divested plaintiffs of their property or liberty without *any* state-conferred power. *See infra* Part V.B.2.

seeability is in contrast to the deprivations of property in *Parratt* and *Hudson*, as well as in this dispute. The South Carolina Code prescribed precisely how the Defendants were to act once they seized Bogart's dogs and cats: the Defendants had no choice but to care for the animals, and were not under any circumstances permitted to euthanize them, until after a state court adjudicated Bogart's custody rights. *See supra* notes 3 & 6. Because the Defendants lacked authority to destroy the animals immediately upon their seizure (and because such an incident had not previously occurred), the State could not predict this deprivation. *Cf. Zinermon*, 494 U.S. at 136 (noting State's predicament in *Parratt* and *Hudson*, that it might have anticipated employee's occasional negligent loss or intentional destruction of prisoner's property, but it could not have known precisely when such loss would occur).

Second, this dispute diverges from *Zinermon* in that predeprivation process was impossible here. The State in *Zinermon* had provided some procedures for the voluntary and involuntary admission of patients to mental hospitals, but failed to sufficiently limit and guide the hospital personnel's power. 494 U.S. at 136-37. The plaintiff's grievance was that the hospital personnel, in exercising their discretion within the statutory scheme, failed to ensure that the proper procedures were followed and that the plaintiff received all of the constitutional process that he was due. *Id.* at 137. Thus, "had the State limited and guided [the hospital personnel's] power to admit patients, the deprivation might have been averted." *Id.* The plaintiff did not allege that the hospital personnel had engaged in conduct like that of the correctional officer in *Hudson* or of the Defendants in this case, in that the hospital personnel were not bent upon depriving the plaintiff of his liberty and would not have done so despite predeprivation safeguards. *Id.*

By contrast, South Carolina did not fail to sufficiently limit the Defendants' discretion in euthanizing Bogart's animals immediately after their seizure. Rather, the State withheld any such discretion at all from the Defendants. For predeprivation process to be deemed feasible under these circumstances, it would have to be concluded that the State was required to afford a "preliminary" hearing — prior to the court proceedings already provided for by statute — to determine whether the Defendants should destroy Bogart's animals in violation

of their mandate to care for them. Such a conclusion would, of course, be absurd.[12]

Finally, this dispute is unlike *Zinermon* because the Defendants' euthanization of Bogart's animals is properly characterized as unauthorized, in the sense that term was used in *Parratt* and *Hudson*. The State in *Zinermon* had delegated to the hospital personnel "the power and authority to effect the very deprivation complained of . . . and delegated to them the concomitant duty to initiate the procedural safeguards set up by state law to guard against unlawful confinement." 494 U.S. at 138. Conversely, the Defendants bore the nondiscretionary duty to care for Bogart's animals pending the outcome of due process procedures — procedures that were to be provided not by the Defendants themselves, but rather by the state courts. *Cf. Zinermon*, 494 U.S. at 138 (recognizing that state employees in *Hudson* and *Parratt* did not have authority to deprive prisoners of property or duty to initiate predeprivation safeguards).[13]

---

[12]It is "the very nature" of Bogart's deprivation, like those in *Parratt* and *Hudson*, that "made predeprivation process 'impossible.'" *Zinermon*, 494 U.S. at 137. That is, in *Hudson*, "the errant employee himself could anticipate the deprivation since he intended to effect it, but the State still was not in a position to provide predeprivation process, since it could not anticipate or control such random and unauthorized intentional conduct." *Zinermon*, 494 U.S. at 137 (citing *Hudson*, 468 U.S. at 533-34). Similarly, the State could not have been expected to prevent the deprivation in *Parratt* by enacting a rule forbidding its employees from losing mail by mistake, or by providing a hearing to determine whether its employee should engage in negligent conduct. *Zinermon*, 494 U.S. at 137 (citation omitted).

[13]We part company with the assessment of our distinguished dissenting colleague to the extent she concludes that South Carolina conferred on the Defendants both the authority to euthanize Bogart's animals and the duty to initiate predeprivation procedural safeguards, such as would bring this dispute under the ambit of *Zinermon* and *Plumer*. *See post* at 27 n.1. While the statutory scheme indeed would have authorized the Defendants to make "humane disposition" of the animals following Bogart's conviction on an animal cruelty violation, *see* S.C. Code Ann. § 47-1-150(F), Bogart was not convicted of such a crime. The Defendants certainly did not possess "the power and authority to effect the very deprivation complained of": the euthanization of Bogart's animals imme-

The teaching of *Zinermon*, it seems, is that where, as in this dispute, state employees do *not* have broad authority (or, indeed, any authority) to deprive persons of their property or liberty, and do *not* have a duty to provide the procedural safeguards required before a deprivation occurs, the *Parratt/Hudson* doctrine still bars a § 1983 procedural due process claim based on the employees' random and unauthorized conduct. But where, as in *Zinermon*, state employees *do* have broad authority to effect deprivations, as well as the duty to provide predeprivation procedural safeguards, the *Parratt/Hudson* doctrine is inapplicable.[14] Therefore, we can only conclude that, under the

diately after her arrest. *Zinermon*, 494 U.S. at 138; *see also Plumer*, 915 F.2d at 931. Moreover, the Defendants may have been required upon seizing the animals to petition a magistrate judge for a speedy hearing to determine Bogart's custody rights, but only, it seems, if the Defendants had acted pursuant to the statutory provision allowing seizure by court order preceding the owner's arrest. *See* S.C. Code Ann. § 47-1-150(C). It is not at all clear that the Defendants acted under that provision, rather than the provisions permitting seizure in conjunction with the owner's arrest, S.C. Code Ann. §§ 47-1-120 and -140. *See supra* note 6. And, even if the Defendants were mandated to notify the magistrate judge to schedule a custody hearing, the imposition of such a miniscule obligation did not rise to the level of the delegation in *Zinermon* of the State's "duty to see that no deprivation occur without adequate procedural protections." 494 U.S. at 135; *see also Plumer*, 915 F.2d at 931. In this dispute, that duty fell to and rested upon the state courts.

[14]In apparent recognition that this dispute cannot be analogized to *Zinermon* unless the State vested some authority and discretion in the Defendants to euthanize Bogart's animals as they did, Bogart seeks to rely on the York County Policy. However, for the reasons explained above, we must consider the viability of Bogart's procedural due process claim without regard to the Policy, which, in any event, does not appear on its face to have authorized the conduct at issue.

Otherwise, Bogart contends that the euthanization of her dogs and cats was predictable, because it was contemplated by Officer Terry and other Defendants at least a week before the search and seizure at her property. Bogart's position rests on the erroneous notion that foreseeability is judged from the perspective of the state actor, rather than, as she asserts in her brief, that of the "disembodied State." The Supreme Court rejected that very proposition in *Hudson*, observing that "[w]hether an individual

*Parratt/Hudson* doctrine, the random and unauthorized euthanization of Bogart's animals by the Defendants — however atrocious — did not constitute a violation of Bogart's procedural due process rights because a meaningful postdeprivation remedy for the loss is available.

## VI.

Pursuant to the foregoing, the district court properly concluded that Bogart does not possess a viable § 1983 procedural due process claim, and we therefore affirm its judgment.

*AFFIRMED*

WILLIAMS, Circuit Judge, dissenting:

Were we deciding this case on a clean slate, I would agree with almost everything my colleagues in the majority have written. As it stands, however, I believe that we are constrained by circuit precedents, namely *Plumer v. State of Maryland*, 915 F.2d 927 (4th Cir. 1990), and *Fields v. Durham*, 909 F.2d 94 (4th Cir. 1990), to interpret *Zinermon v. Burch*, 494 U.S. 113 (1990), as having had a greater impact on this area of law than that ascribed to it by the majority. Accordingly, I respectfully dissent.

I begin with the premise that *Zinermon* is in tension with *Parratt v. Taylor*, 451 U.S. 527 (1981), and *Hudson v. Palmer*, 468 U.S. 517 (1984). *See Easter House v. Felder*, 910 F.2d 1387, 1408-09 (7th Cir. 1990) (en banc) (Easterbrook, J., concurring). Indeed, as predicted by Justice O'Connor in her dissent in *Zinermon*, the two lines of cases have created confusion in the lower federal courts. *Zinermon*, 494 U.S. at 150 (O'Connor, J., dissenting); *see* Jose R. Juarez, Jr., *The Supreme Court as the Cheshire Cat: Escaping the Section 1983 Wonderland*, 25 St. Mary's L.J. 1, 30 tbl. 1 (1993) (describing both inter-

---

employee himself is able to foresee a deprivation is simply of no consequence. The controlling inquiry is solely whether the state is in a position to provide for predeprivation process." 468 U.S. at 534, *cited in Zinermon*, 494 U.S. at 130. As a result, we reject Bogart's *Zinermon* contentions.

and intra-circuit splits in the application of *Zinermon*) [hereinafter Juarez]. The inconsistency in these cases has its root in two competing views of the proper scope of § 1983 liability.

Scholars have named these two competing visions of § 1983 liability the "legalist" model and the "governmental" model. Larry Alexander, *Constitutional Torts, the Supreme Court, and the Law of Noncontradiction: An Essay on Zinermon v. Burch*, 87 Nw. U. L. Rev. 576, 576-77 (1993) [hereinafter Alexander]; *see also* Juarez, 25 St. Mary's L.J. at 7-12. The legalist model is typified by *Hudson*, and under this view, § 1983 imposes liability only if state lawmakers endorse a constitutional violation. *See Hudson*, 468 U.S. at 533; *see also Monroe v. Pape*, 365 U.S. 167, 202, 237-47 (1961) (Frankfurter, J., dissenting) (urging application of the legalist model to determine whether a constitutional violation occurs "under color of" state law for purposes of § 1983); *cf. Barney v. City of New York*, 193 U.S. 430, 438 (1904) (applying the legalist model in determining what constitutes "state action" under the Fourteenth Amendment). In other words, under the legalist model, no § 1983 liability obtains if a governmental actor violates state law when committing a constitutional violation, unless the state fails to provide a post-violation remedy. In contrast, under the governmental model, which is typified by *Monroe v. Pape*, § 1983 imposes liability for all constitutional violations committed by governmental actors in the scope of their employment — even if the actor violates state law when committing the violation. *See Monroe*, 365 U.S. at 183-87 (applying the governmental model to determine whether a constitutional violation occurs "under color of" state law for purposes of § 1983); *cf. Home Tel. & Tel. Co. v. City of Los Angeles*, 227 U.S. 278 (1913) (applying the governmental model in determining what constitutes "state action" under the Fourteenth Amendment). The Court has vacillated between these two competing viewpoints for almost one hundred years.

The only obvious reason for the different approaches used in *Monroe* and *Hudson* is the location of the Constitutional right asserted by the plaintiff. In *Monroe*, 365 U.S. at 171, the plaintiff asserted a violation of the Fourth Amendment, whereas in *Hudson*, 468 U.S. at 530, the plaintiff alleged a violation of the Due Process Clause. Thus, before *Zinermon*, the mission of lower courts was relatively clear — apply the legalist model to procedural due process claims and apply

the governmental model to other constitutional violations committed by state actors.

If the Court had followed *Hudson* and used the legalist model in *Zinermon*, it would have been an easy case — according to the complaint, the state actors in that case committed the plaintiff to a mental institution in willful violation of Florida's procedural requirements. *Zinermon*, 494 U.S. at 121 ("Defendants . . . knew or should have known that Plaintiff was incapable of voluntary, knowing, understanding and informed consent to admission and treatment . . . . Nonetheless, Defendants . . . seized Plaintiff and against Plaintiff's will confined and imprisoned him and subjected him to involuntary commitment and treatment . . . . Plaintiff was without the benefit of counsel and no hearing of any sort was held at which he could have challenged his involuntary admission and treatment."); *id.* at 122-23 (describing the extensive procedures mandated by Florida law prior to involuntary commitment). Under the reasoning of *Hudson*, the actions taken by the *Zinermon* defendants were "random and unauthorized," and the state could not have foreseen its employees' failure to comply with the established state procedures. *Hudson*, 468 U.S. at 533. Thus "the state's action" would not have been "complete until and unless it provide[d] or refuse[d] to provide a suitable postdeprivation remedy." *Id.*

Similarly, if the Court had overruled *Hudson* and adopted the governmental model for procedural due process claims, *Zinermon* would, again, have been an easy case — a state employee acting within the scope of his employment deprived the plaintiff of his liberty, without the predeprivation hearing to which the Constitution entitled him. Under the reasoning of *Monroe*, the state officials acted under color of state law when they deprived the plaintiff of his liberty without a hearing, and the plaintiff thus would have been entitled to bring a § 1983 claim in federal court.

Rather than choosing between the two competing models, however, the Supreme Court, in a rather vague opinion, used language indicating its adherence to *both* models. *Zinermon*, 494 U.S. at 136-38. Although *Zinermon* relied on *Monroe*, the paradigmatic example of the governmental model of § 1983 liability, and clearly retreated from the legalist model, for whatever reason, the Court did not overrule

*Hudson. Zinermon*, 494 U.S. at 135 ("It is immaterial whether the due process violation Burch alleges . . . aris[es] from petitioners' failure to comply with state procedures for admitting involuntary patients."); Alexander, 87 Nw. U. L.R. at 587.

Thus, when we decided *Fields* and *Plumer*, we were faced with a line of Supreme Court precedents that resembles, as Judge Easterbrook has colorfully described, "the path of a drunken sailor." *Easter House*, 910 F.2d at 1409 (Easterbrook, J., concurring); *see also* Alexander, 87 Nw. U. L.R. at 596 ("It is not an overstatement to describe the Supreme Court's constitutional torts jurisprudence as a welter of confusion, leaving litigants and lower courts completely at sea."). Lower courts were, it seemed, free to chose whichever model they preferred by reading *Zinermon* narrowly or broadly. In *Plumer* and *Fields*, we interpreted *Zinermon* broadly, concluding that the Court had adopted the governmental model of determining liability for procedural due process claims under § 1983. *Plumer*, 915 F.2d at 930-31; *see also* Juarez, 25 St. Mary's L.J. at 36 & app. 1 ("The United States Court of Appeals for the Fourth Circuit has consistently followed the [g]overnmental [m]odel."). Although other circuits narrowly read *Zinermon* in order to retain the legalist model typified by *Hudson*, *see Caine v. Hardy*, 943 F.2d 1406, 1413 (5th Cir. 1991) (en banc) [*Caine II*]; *Easter House*, 910 F.2d at 1400-02, we rejected that approach. *Plumer*, 915 F.2d at 930-31(citing *Caine v. Hardy*, 905 F.2d 858, 862 (5th Cir.1990) *overruled en banc* by *Caine II*, 943 F.2d 1406); *cf. Easter House*, 910 F.2d at 1400 ("[W]e note that the phrase 'random and unauthorized', as it has been employed since the decision in *Parratt*, can be interpreted both narrowly and broadly."). The courts that narrowly read *Zinermon* focus on whether the state has granted broad discretion to its employees in carrying out their duties to determine whether a case is covered by *Zinermon*. *See*, *e.g.*, *Easter House*, 910 F.2d at 1401 ("Although the appellants did exercise a certain amount of discretion and authority over the failure or success of renewal applications, that discretion was not 'uncircumscribed' or otherwise unregulated."). As no state gives its employees discretion to violate state law, however, the violation of state procedural rules means that *Parratt/Hudson* applies and no § 1983 liability exists for the failure to comply with the existing state procedures. The majority essentially follows this approach today. *See ante* at 20.

Under *Plumer*, however, the *Parratt/Hudson* doctrine does not apply when "erroneous . . . deprivation[s are] foreseeable" and "pre-deprivation procedures are practicable." *Plumer*, 915 F.2d at 931. Moreover, when a state implements predeprivation procedural safe-guards, it demonstrates both that predeprivation procedures are practi-cable and that erroneous deprivations are foreseeable. *Id.*; *Fields*, 909 F.2d at 97 ("We believe that th[e] risk was foreseeable, and that [the state] acted to address it by prescribing predeprivation procedures to ensure that [erroneous deprivations did not occur]."). We only look to the adequacy of postdeprivation process when it "truly is impossible" for the state to provide predeprivation procedures "before a person unpredictably is deprived of his liberty or property through the unau-thorized conduct of a state actor." *Plumer*, 915 F.2d at 930. Under *Plumer*, the very fact that governmental actors failed to comply with an established state procedural scheme before depriving someone of her property "indicate[s] . . . the inapplicability of *Parratt*" — regard-less of whether the actor is vested with broad discretion by the proce-dural scheme. *Plumer*, 915 F.2d at 931; *Fields*, 909 F.2d at 97. "In short, when a state government can and does provide a predeprivation hearing and charges its employees with effecting the deprivation com-plained of, the availability of an adequate state postdeprivation rem-edy does not, standing alone, satisfy the Due Process Clause." *Plumer*, 915 F.2d at 931. Thus, if the Constitution requires prede-privation procedures, it is no defense to § 1983 liability that state law establishes the requisite predeprivation procedures, if those proce-dures were not used in a given case.

For example, in *Fields*, school officials were accused of firing a tenured professor without following the pretermination procedures required by state law. *Fields*, 909 F.2d at 96-97. Even though the offi-cials had not followed the letter of state law, they had provided the professor with some pretermination process. The officials had no dis-cretionary authority not to follow the constitutionally adequate proce-dures established by state law, but we nonetheless held that *Parratt* was inapplicable. *Id.* Although we concluded that the pretermination procedures actually afforded the professor suffced to satisfy due pro-cess under *Mathews v. Eldridge*, 424 U.S. 318, 333 (1976), had they been inadequate, liability would have attached. *Fields*, 909 F.2d at 96-97.

We also applied the governmental model of liability in *Plumer*. To paraphrase *Plumer* in the factual context of this case:

> [T]he risk of an erroneous [animal forfeiture] clearly was foreseeable. Indeed, [South Carolina] surely realizes that for it has developed procedural safeguards to protect against erroneous deprivations. When utilized, the procedures established by [South Carolina] to ensure correct [animal forfeitures] have significant value in guarding against any erroneous deprivations. But the fact that the predeprivation procedures are practicable indicates, as in *Zinermon*, the inapplicability of *Parratt*.

*Plumer*, 915 F.2d at 931; *see also Fields*, 909 F.2d at 97 ("[W]e first ask whether the risk of an erroneous deprivation was foreseeable.").[1]

---

[1]The majority holds that "the Defendants' euthanization of Bogart's animals is properly characterized as unauthorized . . . ." *Ante* at 20. Because the Defendants' actions were "foreseeable" as that term is used in our precedents, and predeprivation procedures were practicable, I need not decide whether the Defendants' actions were also "unauthorized." *See Plumer v. State of Maryland*, 915 F.2d 927, 931 (4th Cir. 1990) ("[T]he fact that the predeprivation procedures are practicable indicate . . . the inapplicability of *Parratt*."); *Fields v. Durham*, 909 F.2d 94, 97 (4th Cir. 1990) ("[W]e first ask whether the risk of an erroneous deprivation was foreseeable."). I note, however, that under *Plumer*, "the conduct of . . . state employees . . . [i]s not 'unauthorized' [if] the state has delegated to its employees 'the power and authority to effect the very deprivation complained of . . . and also delegated to them the concomitant duty to initiate the procedural safeguards set up by state law . . . .'" *Plumer v. State of Maryland*, 915 F.2d 927, 931 (4th Cir. 1990). In this case, the animal control officers who seized Bogart's animals are the ones who ultimately would be charged with making a "humane disposition" of the animals if Bogart was adjudicated unable to care for them. S.C. Code Ann. § 47-1-150(F)(2). They were also charged with "petition[ing] the magistrate or municipal judge of the county or municipality wherein the animal [wa]s found for a hearing" immediately after the seizure. S.C. Code Ann. § 47-1-150(H). Given these requirements, it seems clear that South Carolina "has delegated to [the Defendants] the power and authority to effect" euthanizations and also the "concomitant duty to initiate the procedural requirements set up by" South Carolina law. *Plumer*, 915 F.2d at 931.

South Carolina has established a detailed procedural scheme governing the seizure and care of cruelly-treated and neglected animals. *See* S.C. Code Ann. §§ 47-1-120, -140, -150, -170 (Law. Co-op. 1987 & Supp. 2003). That scheme provides two different methods for the seizure of animals. Animals may be seized during the course of an arrest for animal cruelty or pursuant to a warrant issued by a magistrate.[2] *See id.* §§ 47-1-120, -150(C). Regardless of the method employed to seize an animal, the owner is entitled to either criminal or civil process before forfeiting the animal. *Id.* §§ 47-1-150(F), -170. Clearly, South Carolina's procedural scheme is constitutionally sufficient — it provides for predeprivation notice and hearing, and Bogart has not argued that the Constitution requires more. *See Mathews*, 424 at 333. But that simply is not the end of our inquiry under the governmental model of liability that we have adopted. We must also examine, as we did in *Fields* and *Plumer*, the predeprivation process *actually afforded* Bogart in this case. If that process was inadequate, the state officials who deprived her of her property are liable under § 1983 — just as they would be for executing a search or an arrest without a warrant.

The procedures actually afforded Bogart in this case were not constitutionally sufficient. As the majority notes, the Constitution generally requires a pre-deprivation hearing before the destruction of one's animals. *Mathews*, 424 U.S. at 333; *see Nicchia v. New York*, 254

---

[2]I note that in the district court, and in its initial brief on appeal, the County argued that it seized Bogart's animals pursuant to the civil warrant provisions of S.C. Code Ann. § 47-1-150 (Law. Co-op. Supp. 2004). (J.A. at 304 ("South Carolina . . . passed . . . 47-1-150 . . . . And they set out . . . specific state law procedures to govern in cases such as this. . . . [S]ubsection B [of 47-1-150] provides for certain due process rights, provides for a hearing before a magistrate, [and] it provides for notice to be given."); J.A. at 309 ("[W]hat [Bogart is] talking about obviously is 47-1-150."); Appellee's Br. at 17 (citing § 47-1-150).) This position corresponds with the facts of the case, given that Officer Mabry obtained a warrant as required by section 47-1-150 and that the defendants began seizing animals well before Bogart was arrested for animal cruelty. (J.A. at 157.) The County, however, switched course in its supplemental brief and argued that the animals were seized pursuant to section 47-1-120 incident to Bogart's arrest for animal cruelty. As discussed, infra, under either statutory provision, Bogart was entitled to a hearing before forfeiting her animals. §§ 47-1-150(F), -170.

U.S. 228, 230 (1920). Thus, if a state procedural scheme provided for the summary killing of all seized animals, the scheme would be patently unconstitutional. Here, unlike the professor in *Fields*, Bogart undisputedly received *no predeprivation process at all*. Her animals were summarily killed after being seized by the very officials responsible for initiating the statutory hearing under South Carolina law. S.C. Code Ann. §§ 47-1-150(C), (D) (Law. Co-op. Supp. 2004). It follows that because Bogart did not receive the process she was constitutionally due before the destruction of her animals, she is entitled to maintain a § 1983 claim notwithstanding the availability of adequate postdeprivation state tort remedies.

If this were a case of first impression, I would follow the legalist model typified by *Hudson* and read *Zinermon* narrowly, as do several of our sister circuits. Justice Holmes strongly defended the legalist model in his dissent from *Raymond v. Chicago Union Traction Co.*, 207 U.S. 20, 41 (1907) ("I am unable to grasp the principle on which the state is said to deprive the appellee of its property without due process of law because a subordinate . . . , subject to the control of the supreme court of the state, is said to have violated the express requirement of the state in its Constitution."), as did Justice Frankfurter in his dissent from *Monroe*, 365 U.S. at 237 ("The jurisdiction which Article III of the Constitution conferred on the national judiciary reflected the assumption that the state courts, not the federal courts, would remain the primary guardians of that fundamental security of person and property which the long evolution of the common law had secured to one individual as against other individuals. The Fourteenth Amendment did not alter this basic aspect of our federalism."). I find the arguments of these notable jurists persuasive.

Unfortunately, we are bound by the broad interpretation of *Zinermon* contained in *Plumer* and *Fields*. Thus, although I agree that the majority's interpretation of *Zinermon* is the preferable one, and perhaps even "the best estimate of the course a majority of the [Supreme] Court will take" to resolve the "[i]nconsistent lines of precedent," *Easter House*, 910 F.2d at 1409 (Easterbrook, J., concurring), I believe that we, as a panel, should refrain from muddying the clear law of this circuit by adding to our body of precedents an opinion that relies upon the legalist model. By doing so today, the majority creates an inconsistent line of precedents in our circuit. If we wish to follow

the narrow interpretation of *Zinermon* used in the Fifth and Seventh Circuits, we must first overrule *Plumer* and *Fields* in an en banc session. Because we have not done so, I would reverse the district court and allow Bogart to proceed with her procedural due process claim. Accordingly, I respectfully dissent.