*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0348p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

WILLIAM T. MONTGOMERY,
  *Petitioner-Appellee/Cross-Appellant,*

  *v.*

MARGARET BAGLEY, Warden,
  *Respondent-Appellant/Cross-Appellee.*

> Nos. 07-3882/3893

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 00-07298—Solomon Oliver, Jr., District Judge.

Argued:  June 17, 2009

Decided and Filed:  September 29, 2009

Before:  MERRITT, CLAY, and GIBBONS, Circuit Judges.

_____

**COUNSEL**

**ARGUED:**  Stephen E. Maher, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant.  Richard Marvin Kerger, KERGER & HARTMAN, LLC, Toledo, Ohio, for Appellee.  **ON BRIEF:**  Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant.  Richard Marvin Kerger, KERGER & HARTMAN, LLC, Toledo, Ohio, Lori A. McGinnis, Loudonville, Ohio, for Appellee.

MERRITT, J., delivered the opinion of the court, in which CLAY, J., joined. GIBBONS, J. (pp. 18-21), delivered a separate dissenting opinion.

_____

**OPINION**

_____

**I. Summary**

MERRITT, Circuit Judge.  In this death penalty case, the State of Ohio, through the Respondent, Warden Margaret Bagley, appeals the District Court's new trial order granting William T. Montgomery's petition for a writ of habeas corpus under 28 U.S.C. § 2254, and its subsequent denial of the State's motion to reconsider that order.  *See Montgomery v. Bagley*, 482 F. Supp. 2d 919 (N.D. Ohio 2007).  The District Court issued the writ based on a finding that the State, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), withheld an exculpatory, pretrial police report that would likely have altered the outcome of the case — a pretrial report that several witnesses had seen one of Montgomery's purported victims alive four days after the State alleged that he had killed her.  Montgomery cross-appeals the District Court's denial of his petition on several alternative grounds, including the state trial court's failure to grant a change of venue despite negative pretrial publicity, the State's failure to disclose certain other *Brady* material, and the trial court's failure to dismiss an incompetent juror.

The key issue for us to resolve under *Brady* is whether the withheld police report is "material" to Montgomery's jury conviction or the jury's imposition of the death sentence when viewed in light of the other evidence presented at trial.  The Warden's argument that the withheld police report is not "material" has two components:  *First*, given the strength of the other evidence at trial implicating Montgomery, the introduction of the police report would have made no difference in the outcome of the trial.  *Second*, in affidavits submitted to the habeas court 23 years after the jury trial and seven weeks after the court had issued the writ, the State now claims that several of the pretrial police-report witnesses have retracted their earlier statements, which now proves that the exculpatory report could neither be effectively used in a new trial to cast doubt on the state's case, nor could it have led to such evidence in the past.

Montgomery argues that the evidence at trial implicated his co-defendant, Glover Heard, as the trigger man so that introduction of the withheld police report would have given

the jury reasonable doubt as to his *guilt*. Alternatively, on the issue of death, Montgomery also contends that the police report would probably have created enough doubt in at least one juror's mind to raise a question about his role as the trigger man, resulting in that juror's rejection of the death penalty for Montgomery. Under Ohio law, if only one juror rejects the death sentence, a life sentence would be imposed. Ohio Rev. Code Ann. § 2929.03(D)(2).

The law under *Brady* follows the common sense proposition that the State must disclose the "material exculpatory evidence to the defendant *before* trial," not afterward. *See Dist. Attorney's Office for the Third Jud. Dist. v. Osborne*, 129 S. Ct. 2308, 2319 (2009) (emphasis added). It directs us not to retry the case by weighing the existing evidence against the excluded evidence, but rather to determine whether the excluded evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). The *Brady* due process rule concerning disclosure of exculpatory evidence complements and supports the Sixth Amendment rule requiring that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State." The *Brady* rule contemplates the ultimate trial of factual issues in a contemporary trial by a jury, not by a subsequent trial in federal habeas court. *See Kyles v. Whitley*, 514 U.S. at 439-40 (explaining that "the criminal trial . . . [is] the chosen forum for ascertaining the truth about criminal accusations").

In this capital case, the State is unable to effectively rebut three crucial propositions that control the outcome: (1) the withheld report is exculpatory and should have been disclosed before trial, (2) it is "material" because, if true, it would likely change the outcome of the trial, and (3) the ultimate determination concerning the truth of the withheld report — *i.e.*, what actually happened — is for the state courts to resolve. Because, like the District Court, we believe that the withheld, exculpatory report "undermines confidence in the verdict" as to both the guilt and sentencing phases of Montgomery's trial, we hold that Montgomery deserves a new trial where all of the relevant evidence is considered by the jury. For the reasons that follow, we affirm the District Court's issuance of the writ and later denial of the State's motion to reconsider. We pretermit the remaining issues raised in Montgomery's cross-appeal.

## II. Facts Found by State Courts and Procedural Background

### A. The Underlying Crime

The Ohio Court of Appeals summarized the facts of the underlying crimes as follows:

> On March 25, 1986, the Lucas County Grand Jury returned a two count indictment charging [Montgomery] with the aggravated murders of Debra D. Ogle and Cynthia Tincher while committing or attempting to commit aggravated robbery, in violation of R.C. 2903.01(B). . . .
>
> On September 29, 1986, the case proceeded to a jury trial at which numerous witnesses testified, including Glover Heard, who was also indicted for the aggravated murders of Ogle and Tincher but who pled guilty to one count of complicity to murder. Through those witnesses, the following key evidence was presented. On February 20, 1986, [Montgomery] purchased a Bursa .380 automatic handgun from Cleland's Gun Shop in Toledo, Ohio. This gun was subsequently identified as the weapon that was used to kill both Ogle and Tincher. At approximately 5:00 a.m. on March 8, 1986, after an apparent argument with his girlfriend, [Montgomery] went by taxi with Glover Heard to an apartment shared by Ogle and Tincher. [Montgomery] was acquainted with the victims but Heard was not. At this time, [Montgomery] was wearing a dark blue pinstriped suit jacket that he had borrowed from Randolph Randleman, his uncle. Subsequently, [Montgomery] asked Ogle to give him a ride home. After Ogle agreed, she, [Montgomery] and Heard left in her car. Before arriving at the destination, however, [Montgomery] had Ogle stop the car. He then walked her into a wooded area along Hill Avenue in Toledo, Ohio, while Heard remained in Ogle's car, and then, for no apparent reason, [Montgomery] shot Ogle three times with the fatal wound inflicted while the gun was in direct contact with the top of her forehead. [Montgomery] then returned to the car and he and Heard drove back to the girls' apartment. [Montgomery] instructed Heard to take Ogle's car. Heard took the car but then abandoned it approximately one block from his residence. [Montgomery] returned to the girls' apartment and shortly thereafter left with Cynthia Tincher in her car. After leaving the apartment, [Montgomery] had Tincher pull to the side of the road and thereupon shot her through the head from a range of twelve inches or less. Several witnesses testified that they saw a man of approximately [Montgomery's] height and weight leaving Tincher's car on the morning of March 8, 1986 at approximately 7:15. Those witnesses testified, however, that the person they saw was wearing a dark jacket with a hood pulled up around his face. Tincher's body was discovered in her car at the corner of Wenz and Angola Roads in Toledo, Ohio at approximately 7:30 a.m. on March 8, 1986. [Montgomery] lives approximately one-half mile from that location. Thereafter, at approximately 12:00 noon on March 8, 1986, [Montgomery], Heard and two friends, Sidney Armstead and Eric Wilson,

got together to go to a mall. [Montgomery], however, was carrying a plastic bag and directed Armstead to first drive him to a dry cleaner. Armstead drove appellant to One Hour Martinizing where [Montgomery] got out of the car with the bag. Although they were unable to identify [Montgomery], employees of the laundry testified that on March 8, 1986, a black male showed them a soaking wet dark blue pin-striped suit jacket that he wanted cleaned in one hour. The employees explained that the jacket would have to dry out before it could be cleaned. They then hung the jacket to dry. One employee testified that as it dried, the jacket made a "brownish dripping mess on the floor." She further testified that the jacket was badly stained and that she had to clean the jacket three times using a chemical cleaner. She could not identify, however, what the stains were. Subsequently, the jacket was picked up. Several days later, police officers obtained the jacket from Randolph Randleman who identified the jacket in court as the one which he had loaned to [Montgomery].

As stated above, on March 8, 1986 at approximately 7:30 a.m., Tincher's body was discovered in her car at the corner of Wenz and Angola. Soon thereafter, Ogle was listed as missing. The following day, however, Ogle's car was discovered behind an abandoned house at 1031 Norwood. Thereafter, on March 10, 1986, Crime Stoppers received a telephone call from a Michael Clark who was at that time incarcerated in the Lucas County Jail. Upon interviewing Clark, officers obtained the name of Glover Heard. Officers located Heard and from Heard they obtained the name of [Montgomery]. Officers then gained permission from [Montgomery's] mother to search her home, where appellant also lived. That search revealed a black leather jacket with a hood and the manual to the Bursa semi-automatic handgun. Subsequently, on March 12, 1986, officers went to Randolph Randleman's home in an attempt to locate [Montgomery]. At approximately 12:00 noon, [Montgomery] arrived at the home and told officers that he knew the officers were looking for him and he wanted to talk about the homicide. He was then arrested and taken to the police station for questioning. During the interrogation, [Montgomery] initially stated that Heard had killed both girls with his, [Montgomery's], gun. He then changed his story but ultimately admitted that he had gone to the girls' apartment for a ride home. He continued to insist, however, that Heard had killed the girls and that he did not know where Ogle's body was. Finally, however, [Montgomery] admitted that he might be able to show officers where Ogle's body was and stated that it was on Hill Avenue near a market. Officers then took [Montgomery] to Hill Avenue and ultimately to a wooded area that appellant identified as the location. Several officers began searching the area while Sergeant Larry Przeslawski stayed in a patrol vehicle with [Montgomery]. After the officers searched one wooded area for a few minutes, [Montgomery] told Sergeant Przeslawski to direct the officers to search a different wooded area. Within five minutes, the officers located the body of Debra Ogle.

> At the conclusion of the trial, the jury found [Montgomery] guilty of the aggravated murder of Debra Ogle with the specifications that said action involved the purposeful killing of two or more persons and that [Montgomery] was the principal offender while attempting to commit aggravated robbery. The jury further found [Montgomery] guilty of the lesser included offense of murder of Cynthia Tincher. At the conclusion of the mitigation phase, the jury recommended that [Montgomery] be sentenced to death. The trial court agreed with the jury's recommendation and ordered that appellant be executed. . . .

*State v. Montgomery*, No. L-98-1026, 1999 WL 55852, at *1-3 (Ohio Ct. App. Feb. 5, 1999) (internal citations omitted).

## B. Post-Conviction Relief in State Court

After Montgomery's conviction was upheld on direct appeal, he began pursuing post-conviction relief in state court. Montgomery submitted seventy claims for post-conviction relief to the state trial court, but his petition for relief was swiftly denied after the State successfully moved for summary judgment. The Ohio Court of Appeals reversed and remanded, holding that the trial court neglected to give Montgomery an adequate opportunity to respond to the State's motion. On remand, the trial court permitted Montgomery to respond, only to later reject his claims for a second time. The Ohio Court of Appeals affirmed the denial of relief, and the Ohio Supreme Court declined to review that decision.

## C. Post-Conviction Relief in Federal Court

Having exhausted his available means for post-conviction relief in state court, Montgomery filed a petition for a writ of habeas corpus in Federal District Court. This time, he alleged forty-eight grounds for relief. After a comprehensive review of the matter, the District Court denied all of Montgomery's claims except the alleged *Brady* violation arising out of the State's withholding of the aforementioned police report. In pertinent part, the police report read as follows:

> [David Ingram] stated that he and several friends were at the Oak Hill apartments on Hill when they saw a Blue Ford Escort with Debbie Ogle driving around the complex. Later they again saw her as a passenger in the same auto. Debbie Ogle waved to them as they knew her from Rogers High School. She was with a white male with long sideburns. She did not appear distressed.

J.A. at 2985.

The report was exculpatory in nature and important because the sighting of Ogle took place at 1:20 A.M. on Wednesday, March 12, 1986, four days *after* the State had argued that Montgomery murdered her. *Id.* at 2984. The District Court not only concluded that the report was exculpatory but also found that there was no doubt that the State had refused to disclose the report — indeed, it only emerged after a formal request for police records some *six* years after Montgomery's trial. *Id.* at 2867. Finally, the District Court considered whether the report was material under *Brady*, that is, whether there was a "reasonable probability" that the outcome of Montgomery's trial would have been different had he been privy to the police report. Finding that the police report met this standard, the District Court issued the writ.

After the District Court issued the writ, a Toledo newspaper ran a story about the case and noted that the District Court's decision was based on the withholding of the 1986 police report. The news soon reached three of the people responsible for the police report, including David Ingram, the man who called in the report shortly after seeing a woman he and his friends said was Debra Ogle. Upon hearing the news, each of the witnesses telephoned the Toledo Police Department to retract their earlier statement. They claimed that the woman they had seen turned out to be Dianna Ogle, the victim's younger sister, a claim they had not made at the time of trial or subsequently. At the behest of the police, the witnesses quickly signed sworn affidavits to this effect. The State then filed the affidavits in the District Court along with a Rule 59(e) motion to reconsider the writ based on this new evidence. Without passing on the materiality of the police report in light of the late-filed affidavits, the District Court denied the Rule 59(e) motion. It held that the affidavits were not properly before the court because they did not qualify as newly discovered evidence under Rule 59, and therefore the court could not justify altering or amending a final judgment on the merits.

There are two distinct questions before our court. First, was the District Court correct to grant the habeas petition? And second, was the District Court correct in refusing to consider the late-filed affidavits under Rule 59(e)? We answer both in the affirmative.

### III.  The Habeas Petition

The State challenges the issuance of the writ on three grounds.  First, the State argues that the District Court did not give due deference to the findings of the Ohio state courts.  Second, the State argues that the police report did not qualify as "evidence" under *Brady* because it would have been inadmissible at trial.  And third, the State argues that the District Court erred as a matter of law in determining that the withheld evidence was "material" under *Brady*.

### A.  Deference

The deference issue necessarily turns upon the adequacy of the review of Montgomery's *Brady* claim in state court.  The Ohio Court of Appeals determined that such information developed during an "ongoing investigation" was not sufficiently exculpatory to require disclosure under *Brady* and limited its discussion only to the following conclusion:

> [Montgomery] asserted that the state wrongfully withheld exculpatory evidence that on March 12, 1986 at approximately 1:30 a.m., Debra Ogle was seen alive in the parking lot of her apartment complex by seven witnesses who went to high school with her.  [Montgomery] supports this claim with a police report taken at approximately 2:30 a.m. on March 12, 1986.  At that time, Debra Ogle was still considered missing although her car had been discovered abandoned behind a home several blocks from the home of the co-defendant Glover Heard.  That report reads in relevant part:

> "[David Ingram] stated that he and several friends were at the Oak Hill apartments on Hill when they saw a Blue Ford Escort with Debbie Ogle driving around the complex.  Later they again saw her as a passenger in same auto.  Debbie Ogle waved to them as they knew her from Rogers High School.  She was with white male with long side burns. She did not appear distressed."

> The lower court concluded that this isolated information, recorded in the course of an ongoing investigation when all of the facts were still being pieced together and in the face of overwhelming evidence presented at trial that Ogle had been killed on March 8, 1986, did not undermine confidence in the outcome of the trial.  We agree and conclude that the trial court did not err in dismissing the fiftieth claim for relief.

*Montgomery*, 1999 WL 55852, at *8.

The District Court characterized this review as "cursory" and commented that the issue "warrants detailed analysis."  *Montgomery*, 482 F. Supp. 2d at 976.  It then went on to

discuss the question of deference under the Antiterrorism and Effective Death Penalty Act (AEDPA) in a detailed footnote:

> Section 2254(d)'s constrained standard of review only applies to claims adjudicated on the merits in the state court proceeding. *Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004). When a state court does not assess the merits of a petitioner's habeas claim, the deference due under the AEDPA does not apply. *Id.*; *Newton v. Million*, 349 F.3d 873, 878 (6th Cir. 2003); *Maples v. Stegall*, 340 F.3d 433, 436-37 (6th Cir. 2003). In such a case, the habeas court is not limited to deciding whether that court's decision was contrary to or involved an unreasonable application of clearly established federal law, but rather conducts a *de novo* review of the claim. *Maples*, 340 F.3d at 436-37; *Benge v. Johnson*, 312 F. Supp. 2d 978, 987 (S.D. Ohio 2004).
>
> While the [Ohio] Court of Appeals addressed this claim, it failed to explain why the fact that the investigation was "ongoing" and "still being pieced together" was sufficient cause for the State's failure to disclose it to the defense. This cursory [sic] may not be construed as an adequate [sic] to explain its reasoning. Moreover, to the extent that the Court of Appeals's analysis of this claim is an "adjudication on the merits," the court finds its application of *Brady* to be unreasonable because it failed to provide more than a conclusory statement regarding the materiality of the withheld report.

*Id.* at 976 n.44.

The State attacks the District Court's ruling on deference by directing our attention to *Maldonado v. Wilson*, 416 F.3d 470 (6th Cir. 2005). In *Maldonado*, we held that where a state court decides a constitutional issue "'without extended discussion,'" the district court "must conduct an independent review," but that its "inquiry remains the AEDPA standard of whether the state court result is contrary to or unreasonably applies clearly established federal law." *Id.* at 476 (quoting in part *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000)). The District Court did not stray from this procedure here. After determining that the Ohio Court of Appeals gave Montgomery's *Brady* claim unduly short shrift, the District Court rightly went on to perform an independent review. When that review led to a different conclusion, the District Court upheld it only after finding (as is required under AEDPA) that the state court's determination to the contrary represented an objectively unreasonable application of clearly established federal law.

## B. "Evidence"

The State's argument that the withheld police report is not "evidence" under *Brady* because it was inadmissible hearsay is not well taken. The police report would have been inadmissible because it was hearsay, but "evidence affecting credibility falls within the general rule" requiring disclosure. *Giglio v. United States*, 405 U.S. 150, 154 (1972). The evidence would have seriously undermined the testimony of the State's main witness, Glover Heard. On its face, the report 23 years ago would have led to witnesses who would have cast serious doubt on the State's case. Failure to disclose such reports "not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist" causing defense counsel to "abandon lines of independent investigation, defenses, or trial strategies that it otherwise might have pursued." *United States v. Bagley*, 473 U.S. 667, 682-83 (1985) ("the reviewing court may consider directly any adverse effect that the prosecutor's failure . . . might have had on the preparation or presentation of the defendant's case."). The report qualifies as exculpatory evidence, and we, therefore, must assess the possible effect of the report and its materiality at the time of the jury trial 23 years ago when defense counsel had to prepare and try the case.

## C. Materiality

The State challenges the District Court's finding on materiality on two grounds. First and foremost, the State argues that its case in trial court was so strong that any potential testimony of witnesses claiming to have seen Debra Ogle alive on March 12 would not have changed the outcome. The District Court responded to this argument as follows:

> [M]uch of the State's case was made through co-defendant Heard, who gave police four different versions of his knowledge of the murders, and then testified to a fifth version at trial. While the State's theory was that Montgomery committed the murder to rob Ogle, Heard admittedly wound up with Ogle's car and wallet and testified that he was planning to take Ogle's car even in the absence of Montgomery's instruction to do so. Under the circumstances, where the State's theory was that Tincher was killed to cover up Ogle's murder, . . . the withheld police report revealing information suggesting that Ogle was seen alive four days after she was allegedly murdered would have severely undercut Heard's credibility and destroyed the State's timeline of the case.

*Montgomery*, 482 F. Supp. 2d at 978. This conclusion makes sense. The police report strikes at the heart of the State's case in directly contradicting Heard's testimony. With Heard sufficiently impeached, there was a reasonable probability that the jury may have disbelieved his testimony that Montgomery was involved in the murders and, moreover, was the triggerman in both killings. The police report was thus material to the jury's finding on guilt, giving rise to a violation of Montgomery's right to due process. *See Cone v. Bell*, 129 S. Ct. 1769, 1772 (2009); *Brady*, 373 U.S. at 87.

The report was also material to the jury's later decision to impose the death penalty, giving rise to Due Process and Eighth Amendment violations. In *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion), and its progeny, the Supreme Court established that the Eighth Amendment guarantees a capital defendant the right to introduce all relevant mitigating evidence in the penalty phase. The Court noted that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id*. (emphasis in original); *see also Eddings v. Oklahoma,* 455 U.S. 104, 110 (1982).

The Supreme Court has also held that the Due Process Clause requires that a state's rules of evidence not be applied mechanically when doing so would preclude the defendant from introducing highly relevant evidence at the penalty phase. *Green v. Georgia,* 442 U.S. 95, 97 (1979) (citing *Lockett*, 438 U.S. at 604-05) (per curiam). Following *Lockett* and *Eddings*, the exclusion of hearsay testimony at the penalty phase of a death penalty case violates the Due Process Clause of the Fourteenth Amendment where "[t]he excluded testimony was highly relevant to a critical issue in the punishment phase of the trial, and substantial reasons existed to assume its reliability." *Id*. In *Green*, the Court reversed the death sentence based upon the trial court's application of Georgia's hearsay rule to prohibit a witness' testimony that the defendant's accomplice in the capital murder had confessed to shooting and killing the victim after ordering the defendant to run an errand. The Court held that the Due Process Clause of the Fourteenth Amendment may require the admission of mitigating evidence even if state law rules of evidence would exclude it. *See Green*, 442 U.S. at 96-97.

The government's star witness, Glover Heard, testified that Montgomery was the triggerman in both deaths. That damning testimony undoubtedly played a significant role in the jury's decision to impose the death penalty on Montgomery. Had the jury heard testimony from the witnesses that they saw Debbie Ogle alive in the early hours of March 12, long after the State contends she was killed by Montgomery, it may have raised enough doubt in the mind of one juror to sway that juror, even if he or she had voted to convict Montgomery of the murders, to reject the death penalty. If even one juror had rejected imposition of the death sentence, a life sentence would have been imposed. Ohio Rev. Code Ann. § 2929.03(D)(2). The fact that there may have existed even one juror with a doubt about Montgomery's guilt or the nature of his participation in the crime leads us to question the reliability of the verdict as to the sentence and to conclude that the police report was material to the sentence imposed.

Our dissenting colleague argues in her footnote 1 that the withheld police report is irrelevant and "unacceptable as a mitigating factor" at the capital sentencing or mitigation phase of the trial because she characterizes it merely as the kind of "residual doubt" evidence that may not be considered on the issue of death by the jury under Ohio law. The dissent's proposed procedural rule forbidding the jury's consideration of the police report in assessing evidence at the sentencing phase of the case excludes crucial evidence from the jury's consideration of death. It violates both state and federal law for at least three reasons.

1. The dissent does not recognize that her "residual" doubt argument necessarily presupposes that the exculpatory evidence concerning the nature of the crime was offered in evidence in the first place and assessed by the jury at the guilt phase of the trial. She does not notice that the Ohio statute, Ohio Rev. Code § 2929.04(B), expressly requires at sentencing that the

> trial jury . . . shall consider, and weigh . . . the nature and circumstances of the offense, the history, character and background of the offender, and all the following factors:
> . . . .
> (6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death.

(C) The defendant shall be given great latitude in the presentation of evidence of the factors listed in division (B) of this section and of any other factors in mitigation of the imposition of the sentence of death.

In the instant case we are dealing with "original," not "residual," concealment of evidence at both stages of the trial. It was impossible for the jury to consider the exculpatory evidence at any phase of the case — guilt or mitigation — when the State had completely concealed the statutorily allowed evidence concerning the "circumstances of the offense," and "the degree of the defendant's participation in the offense."

2. Eighth Amendment law is not unclear or "up-in-the-air" on this subject. *Eddings v. Oklahoma* says that states must allow "any relevant mitigating evidence." 455 U.S. 104, 113-14 (1982). *Franklin v. Lynaugh*, 487 U.S. 164 (1988), cited by the dissent, supports this rule. It merely holds that a state court did not have to give a so-called "residual doubt" instruction to the jury. *Id.* at 174. There was no *Brady* exculpatory evidence involved in the *Lynaugh* case. No evidence was concealed. The Supreme Court there makes it clear that "the [state] trial court placed no limitation whatsoever on petitioner's opportunity to press the 'residual doubts' question with the sentencing jury." *Id.* "Consequently, it is difficult to see how the rejection of these instructions denied petitioner the benefit of any 'residual doubts' about his guilt." *Id.* The Supreme Court repeats and again makes it clear that the mitigating evidence rule is mandatory:

> Our edict [is] that, in a capital case, "'the sentencer . . . [may] not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and *any of the circumstances of the offense*.'" *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (quoting *Lockett*, 438 U.S. at 604) . . . .

*Franklin*, 487 U.S. at 174 (second emphasis added).

3. Even if the question for the jury at sentencing could somehow be classified as an issue of "residual doubt," the materiality inquiry in this *Brady* claim is necessarily backward looking. We must determine whether there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," *United States v. Bagley*, 473 U.S. 667, 682 (1985), and whether the withheld evidence "could reasonably be taken to put the whole case in such a different light as to

undermine confidence in the [death] verdict," *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). As our dissenting colleague acknowledges, Montgomery was entitled to rely upon such evidence as a mitigating factor at the time of his conviction and sentence in 1986. *See State v. Watson*, 61 Ohio St. 3d 1, 17 (1991) ("Residual doubt of a capital defendant's guilt may properly be considered in mitigation"). In fact, at that time, the Supreme Court recognized the residual doubt strategy as an "extremely effective argument for defendants in capital cases." *Lockhart v. McCree*, 476 U.S. 162, 181 (1986). Thus, whatever language the dissent may use to characterize or denigrate the concealed report, the failure of the state to turn it over violated federal law at the time and is inconsistent with the present state statute quoted above, § 2929.04(B), enforcing the admissibility at sentencing of evidence concerning "the nature and circumstances of the offense" and "the degree of the offender's participation."

\* \* \*

At oral argument, the State took the position that police and prosecutors must determine what is "material" for the purposes of *Brady* disclosures and, moreover, that this decision is immune from hindsight review by the courts. At oral argument, the following exchange took place:

> **Court:** I think [the State's] position is that it's up to the prosecutor and the police to decide whether such evidence as this [the withheld police report] is true or not true. And depending on whether the prosecutor decides that the [evidence] is true or not true turns the *Brady* materiality.
>
> **State:** Your Honor, that's what I'm saying. That's the position.

Oral Argument, June 17, 2009. The State offers no support for this proposition and betrays a fundamental misunderstanding by the Attorney General of the law the State must follow. Under *Brady*, it is incumbent upon the State to turn over all favorable exculpatory evidence. It is not the sole arbiter of what must be turned over. *See Kyles*, 514 U.S. at 39-40.

As a secondary argument, the State contends that the police report was immaterial because it would not have led to the discovery of exculpatory evidence. For support, it relies on the three retraction affidavits filed 23 years later. The affidavits do not undermine the *Brady* claim until they become admissible and eligible for consideration.

### IV. Denial of the Rule 59(e) Motion to Alter or Amend

The State appeals the District Court's denial of its Rule 59(e) motion based on the three late-filed affidavits. Rule 59(e) permits the amendment, alteration, or vacation of a judgment after its entry. *See* 11 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2810.1 (3d ed.1998). It is an "extraordinary remedy" and is therefore "used sparingly." *Id.* Rule 59(e) motions may be granted upon a showing of "newly discovered or previously unavailable evidence." *Id.* "To constitute 'newly discovered evidence,' the evidence must have been previously unavailable." *Gencorp, Inc. v. Amer. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999). This requires a showing that the evidence could not have been discovered previously with due diligence. *See* 11 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2808 (3d ed.1998) ("The moving party must have been excusably ignorant of the facts despite using due diligence to learn about them."); *see also Bogart v. Chapell*, 396 F.3d 548, 558 (4th Cir. 2005) (upholding the denial of a Rule 59(e) motion where "the movant presented no legitimate justification for failing to timely submit the evidence and had advance notice of the . . . issues."); *Infusion Res., Inc. v. Minimed, Inc.*, 351 F.3d 688, 696-97 (5th Cir. 2003) ("[A] 59(e) motion to reconsider should not be granted unless . . . the facts alleged . . . could not have been discovered earlier by proper diligence."); *Committee for First Amendment v. Campbell*, 962 F.2d 1517, 1523 (10th Cir. 1992) ("[T]he movant must show either that the evidence is newly discovered [and] if the evidence was available at the time of the decision being challenged, that counsel made a diligent yet unsuccessful effort to discover the evidence."); *Chery v. Bowman*, 901 F.2d 1053, 1057 n.6 (11th Cir. 1990) (same).

The District Court denied the State's Rule 59(e) motion based on a finding that the affidavits did not qualify as "newly discovered evidence." It explained:

> [The State] clearly cannot establish that [it] exercised due diligence in procuring this evidence . . . . As is apparent by the addresses listed on their affidavits, [the three affiants] still reside in the Toledo, Ohio area. [The State] has not shown any reason why these witnesses could not have been contacted prior to the court's issuance of the March 31, 2007 Memorandum of Opinion [granting Montgomery's petition for a writ of habeas corpus].

We review the District Court's denial of the Rule 59(e) motion for abuse of discretion, *Betts v. Costco Wholesale Corp.*, 558 F.3d 461, 467 (6th Cir. 2009), and find no

such error in this case.  The District Court correctly noted that each of the affiants still lived in the Toledo, Ohio, area.  What is more, the police report itself listed the name, address, and telephone number of David Ingram, the principal affiant who called in the report in 1986.  Although this contact information may be outdated, it could have been used to locate Ingram and, through him, the two others who now claim that their 1986 sighting was in error.  This fact, coupled with the State's complete inaction (despite notice of Montgomery's *Brady* challenge), is fatal.  Without having made any effort to determine the veracity (or not) of the police report, the State cannot now argue that the information in the affidavits could not have been discovered with due diligence before the writ was issued.

Where previously withheld evidence surfaces after the criminal trial has ended, it is the habeas court's duty to examine the evidence *carefully* to determine whether it is "material" under *Brady*.  To the extent that the State wishes to substantiate its claim that the evidence is *not* material, this is the time to do so.  It is obviously wrong for the State to argue, as it does here, that it can first wait to see if a court hands down an unfavorable opinion, and only *then* begin to look into the issue.[1]

The affidavits upon which the State asked the District Court to revisit its judgment on the *Brady* issue were readily discoverable at the time of trial, at the time the habeas petition was filed and long before the writ was issued.  That the State did not "anticipate that the writ was going to be granted on that particular" claim, and therefore did not investigate it, is not a valid justification for the delay.  Just as successive habeas petitions based on new evidence are dismissed where the evidence "could . . . have been discovered previously through the exercise of due diligence," 28 U.S.C. § 2244(b)(2)(B)(I), the State, under Rule 59(e), is procedurally barred from challenging

---

[1]The following exchange took place at oral argument:

> **Court:**  So [the State] can wait until the ruling is in the federal District Court ten years later, and *then* come forward with whatever evidence [it needs to rebut the claim of a *Brady* violation].  Because now that's the claim that's attracted the District Court's attention. . . .  You can come forward with the out-of-court evidence – never heard of before – that should have been developed at the time of trial . . . and *then* litigate that issue *after* the writ of habeas corpus has been issued?  What kind of judicial system would we have if that were the rule?

> **The State:**  That's habeas corpus, your Honor.

Oral Argument, June 17, 2009.

the grant of a habeas petition based on facts reasonably discoverable long before the writ was issued.

At this point in the proceeding, as the District Court explained, the only proper venue in which the State may introduce the evidence in the affidavits is in state court on retrial. As the Supreme Court has recently reemphasized, the purpose of *Brady* is to require disclosure of "material exculpatory evidence to the defendant *before* trial." *Dist. Attorney's Office for Third Jud. Dist. v. Osborne*, 129 S. Ct. 2308, 2319 (2009) (emphasis added). The timing of the application of the *Brady* rule is designed so that any ultimate exculpatory issues can be addressed by the fact-finders at the time of trial, as contemplated by the Sixth Amendment. Our Constitution retains the Writ of Habeas Corpus in Article I § 9, but it is not its function to require the federal habeas court to conduct a later trial on the merits of a constitutionally defective state murder case. Our function is to review for significant constitutional errors and leave it for the state courts to retry the case when such errors are found.

For the foregoing reasons, we affirm the District Court's issuance of the writ based on the *Brady* violation and its denial of the Rule 59(e) motion to alter or amend. We pretermit the remaining issues raised in Montgomery's cross-appeal.

———————————

**DISSENT**

———————————

JULIA SMITH GIBBONS, Circuit Judge, dissenting.  Because the withheld police report is not material, I respectfully dissent.

In order to establish a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), Montgomery must show that the following three requirements are met:  "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).  In terms of the first requirement, the pretrial police report—which indicated that several witnesses had seen one of Montgomery's alleged victims alive four days after the State argued that he killed her—is favorable to Montgomery because it casts doubt on the State's theory of the case.  As for the second requirement, it is undisputed that this pretrial police report was suppressed by the State.  Indeed, Montgomery was not aware of it until six years after his trial, when it was disclosed pursuant to a formal request for police records.  In terms of the third requirement for a *Brady* violation, however, the parties dispute whether Montgomery "has established the prejudice necessary to satisfy the 'materiality' inquiry." *Id*. at 282.  In order to establish prejudice, "the nondisclosure [must be] so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id*. at 281.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Wilson v. Parker*, 515 F.3d 682, 701–02 (2008) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).  I would find that Montgomery has not satisfied this third requirement.

Montgomery argues that disclosure of this pretrial police report undermines confidence in his conviction.  The evidence at trial, however, overwhelmingly implicated Montgomery as the triggerman in the deaths of Ogle and Tincher.  First, both victims were shot with a .380 pistol that Montgomery bought approximately two weeks before

their deaths. Second, Montgomery's uncle saw Montgomery drunk and in possession of the murder weapon only a few hours before Tincher was found shot dead approximately one-half of a mile from Montgomery's home on March 8. Third, Montgomery admitted to being at Ogle and Tincher's apartment on March 8, and it is undisputed that Ogle was reported missing sometime shortly after Montgomery's acknowledged visit. Fourth, Montgomery was wearing a dark blue pin-striped suit during the night in question, and a few hours after Tincher was found dead and Ogle disappeared, Montgomery took a dark blue pin-striped suit to the dry cleaners that was soaking wet and that made a "brownish dripping mess on the floor" as it dried. Fifth, Heard testified that he was with Montgomery and witnessed Montgomery shoot Ogle. Finally, Montgomery showed police officers where Ogle's body was on March 12.

Given this overwhelming evidence that Montgomery shot Tincher and Ogle, the question is whether the Ohio Court of Appeals unreasonably applied *Brady* in its determination that the withheld police report is not material. The Ohio court found that the vague police report does not undermine confidence in Montgomery's conviction. The police report stated that in the early morning of March 12, David Ingram "and several friends . . . saw a Blue Ford Escort with Debbie Ogle driving around . . . . Later they again saw her as a passenger in same auto. Debbie Ogle waved to them as they knew her from Rogers High School. She was with white male with long sideburns. She did not appear distressed." Viewed alone, this police report could cast doubt on the State's theory that Montgomery killed Ogle on March 8. However, when viewed in the context of the overwhelming evidence supporting the State's theory that Montgomery did kill Ogle, the Ohio court was clearly not unreasonable in its determination that the report's disclosure does not undermine confidence in the verdict. It is worth emphasizing that Montgomery led police to Ogle's body the *same day* of this alleged sighting. At noon on March 12, Montgomery voluntarily sought out the police and admitted to them that both Tincher and Ogle had been killed with his gun, though he stated that Heard had shot them. In other words, mere hours after the alleged sighting of Ogle, Montgomery had already confessed to the police that he had been involved in their murders and that they had been killed with his gun. In light of this overwhelming

evidence of Montgomery's guilt, I would find that the withheld police report is not material.

"[S]aying that a particular nondisclosure was not a *Brady* violation in no way suggests that the prosecutor did not have a duty to disclose the information." *Bell v. Bell*, 512 F.3d 223, 235 n.7 (6th Cir. 2007). However, in this case, I would find that failing to disclose the police report does not amount to constitutional error because Montgomery has not shown that the evidence would have created a reasonable probability of a different result at either the guilt phase of trial or at sentencing.[1] *Id.* at 236. I would thus reverse the district court's writ of *habeas corpus* on this ground.

I also would deny *habeas* relief on Montgomery's additional two claims. Although the majority opinion does not address Montgomery's remaining claims, he also appealed the denial of relief on the following two grounds: (1) whether the trial court should have disqualified a juror who advised the court that she had been a psychiatric patient and that she had seen the defense psychiatrist in a dream twenty years earlier in which he appeared as the devil; and (2) whether the court should have ordered a change of venue on account of pretrial publicity. I agree with the district court's reasoning and would deny Montgomery's petition as to these two claims as well.

---

[1]The majority opinion finds fault with focusing only on the guilt phase of trial in assessing the probability of a different result, overlooking the fact that the suppressed police report is irrelevant to any sentencing issue. The majority's view necessarily is that a juror might have been persuaded by residual doubt—lingering doubts from the guilt phase of trial that, in theory, could affect a juror's decision at sentencing. At the time of Montgomery's conviction and sentencing, defendants were entitled to rely on residual doubt as a mitigating factor. *See State v. Watson*, 572 N.E.2d 97, 111 (Ohio 1991). But, in recognition of the illogic of its use, residual doubt has been deemed unacceptable as a mitigating factor under Ohio law, *see State v. McGuire*, 686 N.E.2d 1112, 1122–23 (Ohio 1997), a rule that has been applied retroactively, *see State v. Bey*, 709 N.E.2d 484, 503 (Ohio 1999), and is not constitutionally required because it is not relevant to sentencing considerations, namely the defendant's character or record, or any circumstances of the offense, *see Franklin v. Lynaugh*, 487 U.S. 164, 174 (1988). The lack of relevance of the suppressed evidence to any sentencing issue highlights the implausibility of speculating that the suppressed evidence could have affected the sentence. In any event, the Ohio Court of Appeals did not unreasonably apply *Brady* because Montgomery has not shown a reasonable probability that the suppressed evidence would have produced a different outcome at either the guilt or sentencing phase.

In response to this observation about the police report's lack of impact on sentencing, the majority says that the dissent has created a procedural rule that would bar consideration of the police report in violation of state and federal law. The point I make has nothing to do with admissibility of the report or any evidentiary rule. My point is simply that if the police report had been admitted and considered, the likelihood that it would have affected sentencing is even less than the likelihood that its consideration would have affected the jury's verdict of guilt.

First, Montgomery claims that a juror's note to the court disclosing her previous psychiatric treatment and describing her dream about the defense psychiatrist demonstrates that she was biased, irrational, and incompetent. After receiving this note from the juror, the trial judge questioned the juror about her impartiality and competence. The trial judge retained the juror only after she reassured him that she could set aside her dream and determine the case solely based on the evidence at trial. I would find that the trial judge acted appropriately and that Montgomery has failed to offer clear and convincing evidence that the juror could not or did not remain impartial. *See Williams v. Bagley*, 380 F.3d 932, 944 (6th Cir. 2004) (noting that a trial court's finding of impartiality is entitled to the presumption of correctness, as required by 28 U.S.C. 2254(e)).

As for the second claim, while this case did involve pretrial publicity, the relevant question in a challenge to the trial court's decision not to change venue is whether the jurors "could not judge impartially the guilt of the defendant." *Patton v. Yount*, 467 U.S. 1025, 1035 (1984). The Supreme Court has stated that a "trial court's findings of juror impartiality may be overturned only for manifest error." *Mu'Min v. Virginia*, 500 U.S. 415, 428 (1991) (internal citation and quotation marks omitted). Montgomery has not demonstrated that there was a "pattern of deep and bitter prejudice shown to be present throughout the community," *Irvin v. Dowd*, 366 U.S. 717, 727 (1961) (internal citation and quotation marks omitted), such that the trial court's findings of impartiality were manifest error.

Because I would deny Montgomery's petition for *habeas corpus* on all three of these grounds, I dissent.